526 P.2d 416
**Robert ROSS, Petitioner,**
v.
**The INDUSTRIAL COMMISSION of
Arizona, Respondent,**
**Roman Metal Products, Respond-
ent Employer,**
**The Fidelity & Casualty Company of New
York, c/o Underwriters Adjusting
Company, Respondent Carrier.**
**No. I CA–IC 895.**

Court of Appeals of Arizona,
Division 1,
Department B.
Sept. 19, 1974.
Rehearing Denied Oct. 16, 1974.
Review Granted Dec. 17, 1974.

Johnson, Hayes & Dowdall, Ltd. by Anthony D. Terry and Dee-Dee Samet, Tucson, for petitioner.

William C. Wahl, Jr., Former Chief Counsel by R. E. Taylor, Legal Counsel, Phoenix, for respondent, The Industrial Commission of Arizona.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, by Donald L. Cross and Lawrence H. Lieberman, Phoenix, for respondent employer and respondent carrier.

## OPINION

HAIRE, Presiding Judge.

On this review of a workmen's compensation award entered by the Industrial Commission, the petitioning workman contends that:

1. Pursuant to the provisions of A.R.S. § 23–1044 E he should have received an unscheduled [1] award for his industrial injury;

2. That in any event he was entitled to compensation from the "second injury" fund created by A.R.S. § 23–1065 A(3) (as amended 1971); and,

3. The Commission should have awarded him medical benefit compensation for cataract surgery required to restore the sight in his non-industrially injured eye.

Prior to the time of his industrial injury, the workman had lost the sight in his left eye due to the formation of a cataract resulting from a non-industrial traumatic eye

1. As used in this opinion, "unscheduled" refers to compensation awarded under the provisions of A.R.S. § 23–1044 C as opposed to "scheduled" compensation awarded pursuant to § 23–1044 B.

injury. His industrial injury occurred on November 14, 1969 when a grinding wheel disintegrated, causing particles to pierce his other eye, resulting in a total loss of vision in that eye. This industrial injury left the workman essentially blind until February 24, 1970, at which time he underwent cataract surgery which restored the sight in his nonindustrially injured eye.

## DO THE PROVISIONS OF A.R.S. § 23–1044 E, AS INTERPRETED BY THE ARIZONA COURTS, REQUIRE THAT UNSCHEDULED COMPENSATION BE AWARDED THE PETITIONER?

 It is well established in Arizona law that when a prior injury has resulted in an earning capacity disability which exists at the time of the occurrence of a subsequent industrial injury, the industrial injury must be treated as unscheduled. The development of this "successive" injury theory under A.R.S. § 23–1044 E[2] and an analysis of pertinent Arizona decisions are set forth in our opinion in Rodgers v. Industrial Commission, 15 Ariz.App. 329, 488 P.2d 685 (1971) (vacated 109 Ariz. 216, 508 P.2d 46 (1973)) and will not be repeated here. However, the following principles pertinent to the issues raised by petitioner must be kept in mind. First, the "previous disability" referred to in § 23–1044 E must be a disability which has resulted in a loss of earning capacity. Goodyear Aircraft Corporation v. Industrial Commission, 89 Ariz. 114, 358 P.2d 715 (1961); McKinney v. Industrial Commission, 78 Ariz. 264, 278 P.2d 887 (1955); Bozman v. Industrial Commission, 20 Ariz.App. 390, 513 P.2d 679 (1973); Duron v. Industrial Commission, 16 Ariz.App. 71, 491 P.2d 21 (1973). Second, this prior injury earning capacity disability must have been in existence *at the time of the occurrence* of the second injury. Blount v.

Industrial Commission, 19 Ariz.App. 245, 506 P.2d 285 (1973); Bozman, *supra*. In the language of the statute, it is the "previous disability as it existed at the time of the subsequent injury" which is pertinent. Third, if the prior injury was a *scheduled* industrial injury, then under Arizona decisional law there is a conclusive presumption that the prior injury not only caused an earning capacity disability, but also that the earning capacity disability continued and was in existence at the time of the subsequent injury. Ronquillo v. Industrial Commission, 107 Ariz. 542, 490 P.2d 423 (1971). On the other hand, if the prior injury was non-industrial, but would have been scheduled had it been industrial, then the same presumption applies initially, but it is not conclusive and may be rebutted by evidence showing no earning capacity loss. Ronquillo, *supra*; Camacho v. Industrial Commission, 20 Ariz.App. 225, 511 P.2d 669 (1973); Sutton v. Industrial Commission, 16 Ariz.App. 334, 493 P.2d 501 (1972).

 Petitioner's prior eye injury would have fallen in a scheduled category had it been industrially related. Therefore, the nonconclusive Ronquillo presumption was applicable to aid petitioner in establishing that his prior loss of sight injury had resulted in an earning capacity disability which was in existence at the time of the subsequent eye injury. In order to rebut this presumption, the respondent carrier introduced evidence which showed that subsequent to his initial eye injury, the petitioner had returned to his employment as a welder and that he had received regular pay increases until he moved to Arizona for personal reasons. Upon locating in Arizona he eventually obtained employment with the respondent employer, again as a welder. Prior to the time of the second injury, the respondent employer was not aware of petitioner's blindness in the

---

2. A.R.S. § 23–1044 E reads as follows:
"E. In case there is a previous disability as the loss of one eye, one hand, one foot or otherwise, the percentage of disability for a subsequent injury shall be determined by computing the percentage of the entire disability and deducting therefrom the percentage of the previous disability as it existed at the time of the subsequent injury."

one eye. According to the respondent employer's shop foreman, petitioner performed his job well, and apparently the loss of vision in one eye had not interfered with his performance of his work. In contrast, the petitioner testified that in his opinion he could have performed better as a welder without the cataract-induced vision loss. There is expert testimony which would indicate that the loss of one eye would not be much of an impediment to obtaining employment. Again, on the other hand, petitioner testified that because of his loss of sight in one eye, one mining employer would not even accept his employment application. One medical witness, who held himself out as an "occupational medicine specialist", testified that certain large employers, as a matter of policy, tend to avoid hiring individuals with preexisting disabilities for the reason that the employers are subjected to too great an exposure under the Arizona workmen's compensation act, that there is a possibility of an increased risk of injury to the individual, and that said employers do not wish to be responsible for possibly adding to a prior disability.

Another expert witness was Dr. John J. Wilde, petitioner's attending ophthalmologist. A lengthy interrogation was conducted of Dr. Wilde concerning the limitations which are placed upon "one-eyed people". He testified that the vast majority of "one-eyed people" find and retain many different jobs. Dr. Wilde explained that the main result of loss of vision in one eye, assuming a normal healthy second eye, was the loss of peripheral vision, and that so far as a loss of depth perception is concerned, a process known as accommodation takes place in which the remaining good eye accommodates, by the utilization of monocular clues to accomplish depth perception. When given the history that petitioner had a vision loss in his left eye from the non-industrial traumatic cataract for approximately two and one-half to three years, Dr. Wilde was of the opinion that petitioner would have been well adapted to the use of his remaining eye and able to pursue his trade.

The foregoing does not purport to be a complete summary of the evidence presented to the hearing officer. Only enough has been set forth to show that while the hearing officer could very reasonably have found that the prior injury had resulted in an earning capacity disability at the time of the subsequent injury, there was evidence sufficient to sustain the hearing officer's determination that the prior injury had not caused such a disability. For somewhat analogous fact situations upholding a finding of no loss of earning capacity, *see* Maness v. Industrial Commission, 102 Ariz. 557, 434 P.2d 643 (1967); Turley v. Industrial Commission, 10 Ariz.App. 21, 455 P.2d 470 (1969); and McDaniel v. Industrial Commission, 8 Ariz.App. 303, 445 P.2d 860 (1968). While the members of this Court might well have reached a contrary decision if we had been the trier of fact, we are bound by the findings of the hearing officer where, as in this case, there is evidence to support his decision. Fidler v. Industrial Commission, 72 Ariz. 250, 233 P.2d 457 (1951); and Merrill v. Industrial Commission, 11 Ariz. App. 564, 466 P.2d 783 (1970).

Petitioner places great reliance upon this Court's decision in Sutton, *supra,* contending that the hearing officer "did not consider the effect of the petitioner's prior disability upon his potential earning capacity." Our language in Sutton to the extent that we attempted to differentiate "potential" earning capacity from "actual" earning capacity might be somewhat misleading, since under the express language of the statute it is clear that in a § 23–1044 E previous injury situation, the pertinent loss of earning capacity must be that which is in existence at a specific point in time—at the time of the subsequent injury. However, Sutton is sound in its holding that a determination of earning capacity is not limited to a consideration of present earnings. The trier of fact should consid-

er all factors relating to the workman's then existing earning potential, including the effect of the workman's physical disability in possibly limiting the scope of more lucrative employment opportunities which otherwise might have been then available. Applying the foregoing to petitioner's claim, we can find no indication that the hearing officer did not consider petitioner's evidence along with all the other evidence in arriving at his decision. Inasmuch as there was reasonable evidence to support the hearing officer's finding that the petitioner was not suffering an earning capacity disability at the time of his second injury, he did not commit error in refusing to enter an award for unscheduled compensation.

## WAS THE PETITIONER ENTITLED TO AN AWARD OF COMPENSATION FROM THE "SECOND INJURY" FUND PURSUANT TO A. R.S. § 23–1065A(3) (as amended 1971)?

A.R.S. § 23–1065 A(3) (as amended 1971) provides in pertinent part as follows:

"A. * * * Such payments shall be placed in a special fund within the administrative fund for the following purposes:

* * * * * *

"3. An employee who loses by separation, or who sustains the permanent and complete loss of the use of a hand, an arm, a foot, a leg or an eye, and who has previously lost by separation, or has permanently and completely lost the use of a hand, an arm, a foot, a leg or an eye, and thereby, as a result of the subsequent loss, becomes in fact totally and permanently disabled, shall receive the compensation provided by § 23–1044 for such subsequent loss, and shall in addition thereto, after termination of the period of compensation provided by § 23–1044, if the permanent total disability continues thereafter, receive compensation at the rate provided in subsection B of § 23–1045, but the additional compen-

sation shall be paid solely from the funds created by this section."

▉▉▉ Upon analysis, the above-quoted statute imposes three conditions which petitioner must meet in order to become eligible for payments from this special fund.

▉▉▉ First he must show that as a result of the subsequent injury he suffered the permanent and complete loss of use of one of the listed bodily members, here, an eye. The facts show that petitioner has met this first condition.

Second, petitioner must show that previously he has *permanently* and completely lost the use of one of the listed bodily members, here, his other eye. Unquestionably, *at the time of the industrial injury*, petitioner had a prior complete loss of use of his other eye. What is the effect of subsequent events? After the industrial injury and after the cataract surgery, petitioner's sight in the previously injured eye was partially restored, so that he had a residual visual impairment of approximately ten to fifteen per cent in that eye. This restoration of sight was accomplished with a special contact lens and glasses for near objects so that the previously injured eye was capable of 20/20 corrected vision. Without the special contact lens the petitioner was essentially blind. Under this fact situation can it be said that petitioner's previous loss of sight was *permanent* as required by the statute? The answer to this question depends upon whether the permanency is to be determined with, or without, the aid of prosthetic devices. We are not aware of any Arizona decisions directly in point. However, in other jurisdictions, when the question concerns a determination of the extent of loss of use for *scheduled* injury purposes, the usual holding is that the loss of use should be judged on the basis of uncorrected vision. 2 Larson, Workmen's Compensation Law, § 58.13 p. 10–185. Since loss of physical function and not factually determined loss of earning capacity is the criterion in scheduled injury cases, the result reached in the scheduled injury decisions cited by

Larson, *supra,* would appear to be sound. The language of A.R.S. § 23–1065 A(3) (as amended 1971), *insofar as it concerns the previous loss of use of a physical member,* likewise sounds exclusively in terms of physical functional disability rather than in an earning capacity disability sense.[3] Accordingly, it is our opinion that the permanency of the previous loss of use for § 23–1065 A(3) purposes should be determined without regard to the availability or possible use of corrective prosthetic devices. We therefore hold that, notwithstanding the subsequent cataract surgery which enabled petitioner to see with the aid of prosthetic devices, he had, within the meaning of § 23–1065 A(3), previously permanently and completely lost the use of an eye. However, this determination does not automatically qualify petitioner for payment from the special second injury fund. He must further show that he qualifies under the third condition of § 23–1065 A(3).

The third condition which petitioner must meet requires a showing that as a result of the subsequent loss he has become *"in fact* totally and permanently disabled"* and, that the "permanent total disability continued [after the expiration of the period of scheduled compensation]". The use of the words "in fact" removes any possibility of reliance by petitioner on the § 23–1045 C(1) presumption of total disability which ordinarily would flow from total and permanent loss of sight of both eyes. Further, it is our opinion that the end result total and permanent *disability* referred to in § 23–1065 A(3) must be a factually determined *earning capacity* disability, State Compensation Fund v. Cramer, 13 Ariz.App. 103, 474 P.2d 462 (1970), determined at the time of the hear-

ing before the finder of fact. Maness v. Industrial Commission, *supra.* Here, the evidence before the hearing officer showed that at the time of the hearing petitioner was gainfully employed in the open market as a TV repairman. Therefore, petitioner having failed to meet the third requirement for qualification for § 23–1065 A(3) compensation, the hearing officer did not err in refusing to award him compensation from that fund. We now proceed to consider the final contention urged by petitioner.

## WAS PETITIONER ENTITLED TO RECEIVE MEDICAL BENEFITS FOR THE CATARACT SURGERY REQUIRED TO RESTORE THE SIGHT IN HIS NON-INDUSTRIALLY INJURED EYE?

It is not entirely clear from petitioner's brief whether he contends that the responsibility for the payment of medical benefits for the cataract surgery should have been that of the respondent carrier or that of the Commission from its special fund.

Considering first the question of the respondent carrier's responsibility, the evidence is clear that the industrial injury neither caused, aggravated, activated, precipitated or accelerated the cataract which had formed in petitioner's left eye as the result of the prior non-industrial injury. The respondent carrier's responsibility for medical benefits cannot be expanded to include completely unrelated previously existing health problems, even though the correction of the previously existing health problems might have been made more desirable by reason of the additional health problems caused by the industrial injury. Here, the performance of the cataract sur-

---

3. Care must be taken not to confuse the principles applicable when determining whether there has been a prior loss of a bodily member for § 23–1065 A(3) purposes as opposed to the question of whether the § 23–1065 A(3) *final result* is permanent and total disability (discussed *infra),* and, also, as opposed to the principles applicable when

analyzing the effect of the prior injury for the purpose of determining whether the subsequent injury should be treated as scheduled or unscheduled (discussed *supra).* In both of the latter instances, the central issue is *earning capacity disability,* whereas, in the former, the issue is actual physical loss.

gery in no way lessened the liability of the respondent carrier for compensation benefis. Its liability, as found by the hearing officer and hereinabove affirmed by this Court, was to pay the compensation benefits scheduled by statute for the loss of sight in one eye. A more equitable argument can be made for imposing liability on the special fund created by A.R.S. § 23-1065. The evidence is clear that after the industrial injury petitioner was totally blind, and, but for the cataract surgery he would have been totally and permanently disabled. Under such circumstances he would have been entitled to compensation from the special fund. By reason of the cataract surgery, the special fund escaped this compensation responsibility. It would seem only reasonable that the special fund should therefore be responsible for paying the medical expenses which enabled it to avoid an otherwise substantial liability. However, the special fund's obligations are specifically set forth in the statute, and reasonable as the above may sound, we can find no statutory provisions which would authorize the payment of medical benefits under the circumstances presented here.

In our opinion the hearing officer did not commit error in refusing to award petitioner medical benefits for the cataract surgery.

The award is affirmed.

JACOBSON, C. J., Division 1, and EUBANK, J., concur.